**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-1055-WJM-KLM

JOHN L. MCNEES,

      Plaintiff,

v.

OCWEN LOAN SERVICING, LLC, a Delaware limited liability corporation, and
DEUTSCHE BANK NATIONAL TRUST COMPANY, as trustee for Ameriquest Mortgage
Securities Inc. Asset-Backed Passthrough Certificates, Series 2003-11, under the
pooling and servicing agreement date[d] November 1, 2003,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS**

---

Plaintiff John L. McNees contends that his home was unlawfully taken from him
through foreclosure.  Proceeding *pro se*, he filed this lawsuit in May 2016.  (ECF No. 1.)
At that time, the only defendants were Ocwen Loan Servicing, LLC ("Ocwen") and
placeholder "Doe" defendants.  There has since been motion practice, the appearance
and withdrawal of an attorney for McNees, and the appearance of a new attorney on his
behalf.  Despite the already-lengthy proceedings, the Court granted McNees's motion,
through his new attorney, to file a second amended complaint because the proposed
complaint was McNees's "first professionally drafted complaint, and sets forth [his]
allegations with much greater clarity than before."  (ECF No. 64.)  As filed, the Second
Amended Complaint drops the "Doe" defendants but adds Defendant Deutsche Bank
National Trust Company ("Deutsche Bank").

Currently before the Court are separate motions from Ocwen and Deutsche Bank requesting partial dismissal of the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (ECF Nos. 71 (Ocwen) & 74 (Deutsche Bank).) Deutsche Bank's motion incorporates all of Ocwen's by reference, and adds alternative arguments unique to Deutsche Bank. (*See* ECF No. 74 at 2.)

For the reasons explained below, the Court grants the motions in part and denies them in part. The upshot is that McNees may proceed on his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, third-party breach of contract, violation of the Colorado Consumer Protection Act, and civil conspiracy. He may also pursue a constructive trust as a remedy, but not as a freestanding cause of action.

## I. LEGAL STANDARD

Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed

even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. BACKGROUND

The Court draws the following facts from the Second Amended Complaint (ECF No. 65), which the Court will refer to simply as the "Complaint" for the remainder of this order. Per the legal standard for Rule 12(b)(6) motions, the Court recites McNees's allegations as if true, without expressing any opinion about whether McNees will ultimately be able to prove them true.

In 1980, McNees purchased a single-family residence in Broomfield, Colorado. (*Id.* ¶¶ 4–5.)[1] In 2003, McNees refinanced the property through a promissory note that "was subsequently purchased and re-packaged in a mortgage backed security managed by Deutsche Bank." (*Id.* ¶¶ 6–8.) "Deutsche Bank retained various loan servicers to service the mortgage . . . ." (*Id.* ¶ 9.) In 2011, that servicer was American Home Mortgage Servicing, Inc. ("American Home"). (*Id.* ¶¶ 9, 18.)

On February 7, 2011, American Home offered to McNees a permanent modification of the promissory note that had existed since 2003. (*Id.* ¶ 18.) The modification fixed the interest rate (previously it was adjustable), established a new monthly payment, and "further provided that $3,926.97 in accrued late charges, modification fees, and other expenses would be deferred until the maturity date," which was November 1, 2033. (*Id.* ¶¶ 21–24, 81.)

---

[1] The Court will mostly cite the Complaint by paragraph number. There is a numbering discrepancy, however. Pages 1–19 count consecutively from paragraph 1 through 104. But Page 20 begins with paragraph 94, and then proceeds to count upward from there to the end of the Complaint. In other words, the Complaint contains two sets of paragraphs numbered 94 to 104. Within this range, the Court will cite the Complaint by page number, to avoid ambiguity.

McNees accepted the modification offer in April 2011. (*Id.* ¶ 19.) From that month until December 2015, McNees made all payments as required under the modified loan. (*Id.* ¶¶ 25–26.) At some point during this timeframe, Ocwen took over from American Home as Deutsche Bank's servicer, although the Complaint is not consistent on precisely when this occurred. One paragraph of the Complaint alleges that, "on or around February 2014, Ocwen became the servicer" (*id.* ¶ 10), while another paragraph alleges that, "[a]t some point in early 2013, Ocwen began servicing the Note" (*id.* ¶ 30).

Perhaps "February 2014" was a typographical error for "February 2013," because the Complaint soon goes on to allege wrongdoing on Ocwen's part "[a]t various points in 2013, 2014, and 2015." (*Id.* ¶ 33.) "[A]pparently without rhyme or reason," Ocwen would accept McNees's mortgage payment, reject it, return it, apply it to "different, unspecified suspense accounts," apply "portions of [it] to principal and interest,"[2] or "otherwise fail[] to account for [it]." (*Id.* ¶¶ 36, 40, 46.) Ocwen also began to charge "inspection fees, late fees, and other unspecified charges." (*Id.* ¶ 37.) As McNees inquired about what Ocwen was doing with his payments and why it was assessing fees, he received contradictory correspondence. (*Id.* ¶¶ 35, 38–39, 41, 52.) He also received correspondence claiming, for example, that a particular payment had been rejected, even though McNees possesses the canceled check images to show that Ocwen negotiated the check. (*Id.* ¶¶ 53–57.) In another example, Ocwen sent McNees an itemized statement of what McNees then owed, but the line items add up to $4,110.06, while the "TOTAL DUE" bottom line claims $7,419.25. (*Id.* ¶¶ 65–70.)

---

[2] The difference between applying it to principal and interest and accepting it is unclear.

In mid-2014, Ocwen retained a foreclosure law firm to initiate foreclosure proceedings against McNees's home.  (*Id.* ¶ 42.)

> Through the course of the foreclosure proceedings, by and through its foreclosure counsel, Ocwen and Deutsche Bank misrepresented the balance due on the note and deeds of trust and any amounts due to cure the alleged arrearage due on the Note, effectively preventing [McNees] from redeeming the Property prior to the foreclosure sale.

(*Id.* ¶ 49.)  Someone—the Complaint does not specify who—"repeatedly presented" Ocwen, "by and through its foreclosure counsel and others," "with [i]ncontrovertible proof that their own account records were false," but "Ocwen and its foreclosure counsel refused to correct their error[s]."  (*Id.* ¶ 62.)

> Ocwen, in conjunction and coordination with Deutsche Bank, and Deutsche Bank's foreclosure counsel[,] continued to pursue foreclosure proceedings against [McNees's home] . . . by making a series of false, misleading, and knowingly inaccurate statements to the Broomfield County District Court and the Broomfield County Public Trustee, even though they possessed proof that their figures [and] calculations were false.

(*Id.* ¶ 87.)  In December 2015, Ocwen succeeded in foreclosing on McNees's home. (*Id.* ¶ 97.)

Ocwen's conduct was not unique to McNees's account.  "Ocwen systemically misprocessed, mis-applied, lost, improperly rejected, and[/]or mishandled [McNees's] monthly mortgage payments and the monthly mortgage payments of thousands of borrowers throughout Colorado and the United States whose loans they serviced."  (*Id.* ¶ 50.)  This has led to a lawsuit filed in 2013 by the Consumer Financial Protection Bureau and several state attorneys general (including Colorado's) in the United States District Court for the District of the District of Columbia, and another lawsuit filed in 2017 by the Consumer Financial Protection Bureau in United States District Court for the

Southern District of Florida. (*Id.* at 19–20.)

McNees brings eleven claims for relief based on the foregoing allegations, namely:

- negligence in servicing his loan (Claim 1);

- negligent hiring and supervision, directed at Deutsche Bank for hiring Ocwen as its servicer, and at Ocwen for hiring third parties that allegedly contributed to the mishandling of the loan (Claim 2);

- breach of contract (Claim 3);

- breach of the implied covenant of good faith and fair dealing (Claim 4);

- negligent misrepresentation concerning the information Defendants gave to McNees about the amounts needed to cure his default (Claim 5);

- fraud, apparently in the statements made to McNees and in the statements made to third parties, such as Broomfield County entities (Claim 6);

- violation of the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. §§ 6-1-101 *et seq.* (Claim 7);

- civil conspiracy between Defendants to accomplish all of the alleged wrongdoing (Claim 8);

- third-party beneficiary breach of contract, asserting that whatever contract may have existed between Deutsche Bank and Ocwen was meant, at least in part, to benefit McNees, and was breached (Claim 9);

- breach of fiduciary duty (Claim 10); and

- a request that McNees's home be placed in a constructive trust (Claim

11).

By way of relief, McNees seeks: damages, including treble damages and attorneys' fees under the CCPA; to recover title to his home (*i.e.*, to void Deutsche Bank's title and rescind the foreclosure sale); and an order of specific performance that Deutsche Bank comply with the terms of the promissory note as modified in 2011. (ECF No. 65 ¶¶ 167–70.)

## III. ANALYSIS

Defendants move to dismiss all of McNees's claims save for Claim 3 (breach of contract). Their primary argument is that the bulk of McNees's claims are barred by the economic loss doctrine. (*See* ECF No. 71 at 4–6.) But this argument overlaps somewhat with causes of action Defendants challenge on other grounds. The Court will first discuss those other causes of action, and then address the effect of the economic loss doctrine.

## A. Breach of the Implied Covenant of Good Faith and Fair Dealing (Claim 4)

In Colorado, "every contract contains an implied duty of good faith and fair dealing." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).

> The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. The covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party. However, it will not contradict terms or conditions for which a party has bargained.

*Id.* (citations omitted).

McNees pleads a good faith/fair dealing cause of action by stating, without elaboration, that "[v]arious portions of the Deed of Trust, Note, and 2011 Modification

permitted the Deutsche Bank and Ocwen to act with discretion concerning plaintiff's loan obligations" (ECF No. 65 ¶ 115) and then going on to allege various breaches, *e.g.*, "[e]ither accepting or rejecting plaintiff's mortgage loan payments without rhyme or reason" and "[r]eturning plaintiff's monthly mortgage payments rather than applying them to any alleged arrearage due under the Note, Deed of Trust, or Promissory Note" (*id.* ¶ 117(a) & (b)).

Defendants argue that generically referring to "various portions" of the governing contracts does not satisfy the requirement from *Amoco Oil*, quoted above, requiring a specific contract term that allows for discretion. (ECF No. 71 at 8.) As for McNees's list of various alleged breaches, Defendants say that it "gives no clue because those allegations are merely a reworded and reordered version of the same conduct that he alleged earlier in the Second Amended Complaint constituted ordinary breaches of contract." (*Id.*) McNees responds by pointing to paragraphs much earlier in the Complaint, where he quotes the governing contracts at length, including language providing that Defendants "may" take actions such as returning a payment rather than applying it. (ECF No. 75 at 13–14 & n.9 (citing ECF No. 65 ¶¶ 13, 15, 16, 19).) In reply, Defendants say that the Complaint does not connect the quoted clauses to the alleged breaches, and the connection is otherwise not obvious because many of the alleged breaches mirror those that he alleges under his ordinary breach of contract claim. (ECF No. 77 at 8–9.) At a minimum, then, Defendants ask that the Court order McNees to "replead the claim and identify which clauses allegedly apply to which breaches." (*Id.* at 9–10.)

McNees certainly could have pleaded this claim more clearly. However, his

response brief convinces the Court that at least some of the alleged breaches of the duty of good faith and fair dealing are plausibly connected to discretion-granting contract language quoted earlier in the Complaint. To be sure, some of the alleged breaches probably are *not* fairly described as flowing from an exercise of contractual discretion. For example, "[r]equiring payment of deferred late charges that were not due and owing until the modified maturity date in 2033" (ECF No. 65 ¶ 117(e)) seems to be a simple breach of the 2011 modification; and the Court cannot imagine a contractual clause that would legitimately grant discretion to "agree[] to and then reneg[e] on written agreements even though plaintiff complied with [them]" (*id.* ¶ 117(f)). But that does not mean that the cause of action fails entirely.

Nor will the Court require McNees to replead this claim with greater specificity. Defendants can seek more detail through contention interrogatories, *see* Fed. R. Civ. P. 33(a)(2), and readdress the matter at summary judgment or trial.

For these reasons, the Court denies Defendants' motions as to Claim 4.

## B. CCPA Violation (Claim 7)

The Colorado Legislature enacted the CCPA "to regulate commercial activities and practices which, because of their nature, may prove injurious, offensive, or dangerous to the public. The CCPA deters and punishes businesses which commit deceptive practices in their dealings with the public by providing prompt, economical, and readily available remedies against consumer fraud." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003).

> To prove a private cause of action under the CCPA, a plaintiff must show:
>
> (1) that the defendant engaged in an unfair or deceptive trade practice;

(2) that the challenged [unfair or deceptive] practice occurred in the course of defendant's business, vocation, or occupation;

(3) that [the challenged unfair or deceptive practice] significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;

(4) that the plaintiff suffered injury in fact to a legally protected interest; and

(5) that the challenged practice caused the plaintiff's injury.

*Id.* at 146–47.

McNees alleges two theories of CCPA violation. The first theory is what McNees represents to be one of the enumerated violations in the statute itself, namely, Colo. Rev. Stat. § 6-1-105(1)(aaa). (ECF No. 65 ¶ 139.) McNees represents paragraph (aaa) to declare that violations of Colo. Rev. Stat. § 12-61-911(1) are CCPA violations. (*Id.*) However, § 12-61-911 was repealed in 2016. *See* Colo. Sess. Laws 2016, ch. 117, § 7. Paragraph (aaa) now cross-references § 12-61-904.5, which regulates mortgage loan originators. It is not clear that either Defendant is a mortgage loan originator with respect to McNees. McNees's outdated reference to § 12-61-911(1) leads the Court to presume that this is an artifact from an old pleading template. Nonetheless, Defendants do not challenge this theory of CCPA violation.

McNees's second theory is that all of the alleged wrongdoing committed against him has been committed in similar ways against "thousands of other Colorado residential mortgage consumers resulting in thousands of similarly situated foreclosures." (ECF No. 65 ¶¶ 140–41.) As to this theory, Defendants argue that McNees fails to demonstrate the third element of the claim, *i.e.*, "that [the challenged unfair or deceptive practice] significantly impacts the public as actual or potential

consumers of the defendant's goods, services, or property." *Rhino Linings*, 62 P.3d at 147. (*See* ECF No. 71 at 9–10.) Defendants argue that "the alleged misrepresentations concerning McNees'[s] mortgage payments and other issues . . . relat[e] to his particular loan," and so do not show public impact. (*Id.* at 10 (emphasis removed).) Defendants further argue that "McNees is alleging a series of private wrongs relating to each borrower, not that [Defendants'] conduct relating to McNees'[s] loan and modification was simultaneously directed and injurious to the broader Colorado public." (ECF No. 77 at 8.)

Defendants' purported distinction does not withstand scrutiny. Under Defendants' theory, the CCPA would likely be narrowed to cases about false advertising, because essentially nothing else can be deemed simultaneously directed at and injurious to both the plaintiff before the Court and the Colorado public. Defendants cite no authority interpreting the CCPA so narrowly. In fact, the only allegedly supporting case Defendants *do* cite is *Hilb v. HSBC Bank USA*, 2016 WL 9738097 (D. Colo. May 26, 2016), where U.S. Magistrate Judge Craig B. Shaffer, presiding by consent, held that the plaintiff had failed to plead public impact of alleged wrongdoing by a mortgage servicer because he "[did] not set forth any well-pleaded facts as to how many other consumers, if any, experienced similar conduct." *Id.* at *6.

Here, McNees does not have the same problem. He has alleged significant public impact, and, contrary to Defendants' argument, these allegations are not "conclusory." (ECF No. 71 at 10.) McNees points to two lawsuits filed against Ocwen by the Consumer Financial Protection Bureau accusing Ocwen of the sorts of alleged wrongdoing that McNees says he experienced. (ECF No. 65 at 19–20.) To be sure,

there is no allegation that Deutsche Bank is a defendant in those suits, but the Complaint creates an inference, plausible enough for pleading purposes, that Deutsche Bank knew about and at least ratified Ocwen's alleged behavior.[3]

Accordingly, the summary judgment phase or later, and not the pleading phase, is the appropriate time to discern whether either Defendant can be held liable for a CCPA violation. The Court rejects Defendants' argument as to Claim 7.

## C.    Third-Party Beneficiary Breach of Contract (Claim 9)

Defendants next argue that McNees has not adequately pleaded a third-party breach of contract claim. "Colorado law recognizes that a person not a party to an express contract may bring an action on the contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely incidental benefit of the contract." *Baker v. Wood, Ris & Hames, Prof'l Corp.*, 364 P.3d 872, 881 (Colo. 2016).[4] "While the intent to benefit the non-party need not be expressly recited in the contract, the intent must be apparent from the terms of the agreement, the surrounding circumstances, or both." *E.B. Roberts Const. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo. 1985).

In this regard, McNees alleges as follows:

> 151. Upon information and belief, Deutsche Bank contracted with Ocwen to service plaintiff's deed of trust and promissory note.
>
> 152. The contract included servicing guidelines and requirements concerning foreclosure alternatives, loan modifications, and repayment plans, and trial period plans,

[3] Moreover, civil conspiracy might encompass this claim, as discussed in Part III.F.3.d, below.

[4] Defendants assume for purposes of their motions that Colorado law would apply to the alleged contract at issue in Claim 9. (ECF No. 71 at 11.)

as well as general obligations concerning the acceptance
and timely processing of monthly loan payments and escrow
payments.

153. Plaintiff, as the borrowers on the deed of trust and
promissory note, were the intended third-party beneficiaries
of the servicing guidelines and requirements concerning
foreclosure alternatives, loan modifications that were
incorporated into the servicing contract between Deutsche
Bank and Ocwen.

154. Ocwen breached its contract with Deutsche Bank . . . .

155. Plaintiff suffered damages as a result of Ocwen's
breach of the servicing contract . . . .

(ECF No. 65 at 29–30.)

Defendants contend that these allegations are insufficient because they do not

establish any intent between Defendants to benefit McNees.  Particularly, Defendants

fault McNees for not alleging: "any terms actually identifying McNees as an express

beneficiary"; "how the surrounding circumstances of Defendants' alleged contract with

each other plausibly establish that McNees was an intended beneficiary of the contract

in even an incidental manner"; or "that Defendants contemplated McNees as a potential

beneficiary at the time they entered into the alleged contract."  (ECF No. 71 at 11–12

(internal quotation marks omitted).)

Defendants ask for more than the pleading standard requires.  To begin, it is

highly plausible to infer that Deutsche Bank and Ocwen had a contract between them

governing Ocwen's services—indeed, it is implausible to infer otherwise.  Next, it is

likewise plausible that the contract had the sorts of terms McNees alleges.  And, in light

of those terms, one can plausibly plead that they were intended, at least in part, to

benefit the borrowers with whom Ocwen would interact.  Defendants cite no authority for

their insinuation that they must have had McNees himself in mind as a third-party

beneficiary, or in other words, that contracting parties cannot form an intent to benefit a *class* of third persons.

For all these reasons, the Court rejects Defendants' argument as to Claim 9.

**D.    Breach of Fiduciary Duty (Claim 10)**

Defendants challenge McNees's fiduciary duty claim. "There is no *per se* fiduciary duty between a borrower and a lender." *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1365 (Colo. App. 1994). But "a fiduciary duty may arise from a business relationship," including a borrower-lender relationship, if there are circumstances that "impel[] or induce[] one party to relax the care and vigilance it would and should have ordinarily exercised in dealing with a stranger." *Id.*

Hoping to satisfy this exception, McNees pleads that he "justifiably reposed a special trust in [Defendants] concerning the handling of his mortgage and concerning Deutsche Bank's promises with respect to the 2011 Modification." (ECF No. 65 ¶ 157.) In his response brief, McNees elaborates that "Ocwen (through its predecessor-in-interest) made the 2011 loan modification offers pre-default and invited trust by expressly authorizing in writing for Plaintiff to make reduced payments on his mortgage." (ECF No. 75 at 8.) Then "Ocwen continued to bill Mr. McNees at the reduced payment amount for months, inviting him to further trust any alleged balance of past due late charges were not due until the maturity date as reflected in the 2011 modification documents." (*Id.*) Consequently, he says, "Ocwen invited Mr. McNees to relax 'the care and vigilance' one would normally have in dealing with the mortgage lender." (*Id.*)

Despite his attempts to incorporate the language from the *Wells Fargo Realty* case, McNees pleads nothing more than that the parties entered into a contract (the

2011 loan modification) and performed according to that contract until Defendants breached it. This is nothing beyond a typical borrower-lender relationship. Claim 10 will be dismissed with prejudice.

## E. Constructive Trust (Claim 11)

McNees's constructive trust claim is pleaded against Deutsche Bank only. (*See* ECF No. 65 at 30.) Deutsche Bank argues for dismissal (*see* ECF No. 74 at 4), relying on *Indian Mountain Corp. v. Indian Mountain Metropolitan District*, 412 P.3d 881, 887 (Colo. App. 2016), where the court stated that constructive trusts "are remedial in nature and are not appropriately pleaded as a separate cause of action." McNees responds that the case on which *Indian Mountain* relied for this proposition, *i.e.*, *Bryant v. Community Choice Credit Union*, 160 P.3d 266, 276 (Colo. App. 2007), misconstrues a Colorado Supreme Court case on which *it* relied, *i.e.*, *Mancuso v. United Bank*, 818 P.2d 732 (Colo. 1991). (ECF No. 76 at 6–7.) McNees then cites several older Colorado cases that appear to speak of constructive trusts as claims for relief rather than remedies. (*Id.* at 7.)

McNees is apparently asking the Court to find that *Bryant* (and *Indian Mountain*, by extension) are erroneous and need not be followed because they are decisions from an intermediate appellate court and the state's highest court has decided, or would decide, otherwise. *Cf. West v. AT&T Co.*, 311 U.S. 223, 237 (1940) (intermediate appellate court's rulings on state law should be followed "unless [the federal court] is convinced by other persuasive data that the highest court of the state would decide otherwise"); *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1240 (10th Cir. 2003) ("This court must determine issues of state law as we believe the highest state court would decide them.").

The Court is not persuaded that *Bryant* misinterpreted *Mancuso*. *Mancuso* states that "[a] constructive trust is a remedial device designed to prevent unjust enrichment. . . . Some instances in which a constructive trust may be imposed are when property is obtained by fraud, duress, or abuse of confidential or fiduciary relationship." 818 P.2d at 737–38. In other words, *Mancuso* speaks of constructive trusts imposed as a remedy for a substantive wrong, such as breach of fiduciary duty and unjust enrichment.[5]

In fairness, however, *Mancuso* is probably best described as not expressing an opinion either way on whether constructive trust may be pleaded as a cause of action, because that specific question was not before the court. The question, then, is whether there is "persuasive data that the [Colorado Supreme Court] would decide [that question contrary to *Bryant* and *Indian Mountain*]." *West*, 311 U.S. at 237.

McNees is correct that the Colorado Supreme Court has previously spoken of constructive trusts as if they are freestanding claims, but these same cases also usually refer to constructive trusts as a remedy for wrongfully obtaining or retaining property, usually through fraud or unjust enrichment. *See In re Marriage of Allen*, 724 P.2d 651, 657 (Colo. 1986) ("The successful plaintiff in a constructive trust action wins an *in personam* order that requires the defendant, the constructive trustee, to transfer specific

_____

[5] McNees highlights the following sentence from *Mancuso*: "When Ms. Mancuso learned that the Bank had seized the funds, she filed suit against the Bank alleging that the Bank was not entitled to set off the funds from her accounts because her funds were special deposits and because her funds were subject to a constructive or resulting trust." *Id.* at 736. From this, McNees argues that the plaintiff in Mancuso pleaded "constructive trust" as a cause of action, not only a remedy. (ECF No. 76 at 6.) This is far from clear in the quoted language. The underlying Court of Appeals decision is similarly ambiguous, discussing "claim[s]" for negligence and conversion, and then addressing the matter of constructive trust (without characterizing it is a "claim") in the context of fiduciary obligation (without stating that the plaintiff had brought a claim for fiduciary breach). *See Mancuso v. United Bank of Pueblo*, 796 P.2d 7, 8–9 (Colo. App. 1990).

property in some form to the plaintiff, the beneficiary of the trust. The purpose of the remedy is to prevent the defendant from being unjustly enriched at the plaintiff's expense."); *Page v. Clark*, 592 P.2d 792, 798–99 (Colo. 1979) (in the context of a constructive trust apparently pleaded as a counterclaim, characterizing constructive trusts as a "remedial device" and going on to analyze whether the party holding the property "was guilty of fraud or an abuse of a confidential relationship" (internal quotation marks omitted)). And, as with *Mancuso*, whether "constructive trust" exists as an independent cause of action was not squarely before the Colorado Supreme Court. Accordingly, none of this is "persuasive data" that *Bryant* and *Indian Mountain* have announced the law of Colorado contrary to how the Colorado Supreme Court would rule.

In this light, Defendants are correct that "constructive trust" is not a substantive cause of action that Colorado recognizes. It is, instead, a remedy when other violations of substantive law have been proven. As a cause of action, then, Claim 11 will be dismissed with prejudice. However, McNees also asserts that he has pleaded constructive trust as "as an equitable remedy." (ECF No. 76 at 5 & n.3 (emphasis removed).) "Constructive trust" does not explicitly appear in his Prayer for Relief, but, in the interest of justice, the Court *sua sponte* construes the request for a constructive trust as if it had been pleaded in the Prayer for Relief. Accordingly, McNees need not amend the Complaint to continue seeking a constructive trust as a remedy.

## F.    Economic Loss Doctrine (Claims 1, 2, 5, 6, 8, and 10)

Finally, the Court reaches Defendants' argument under the economic loss doctrine.

1.     <u>Basic Principles</u>

"[A] party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). "To survive a motion to dismiss based on the economic loss rule, [a party] merely has to allege sufficient facts, taken in the light most favorable to him, that would amount to the violation of a tort duty that is independent of the contract." *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 608 (Colo. 2016). To determine whether contract or tort law is the source of the duty allegedly breached, courts consider "(1) whether the relief sought in negligence is the same as the contractual relief; (2) whether there is a recognized common law duty of care in negligence; and (3) whether the negligence duty differs in any way from the contractual duty." *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74 (Colo. 2004).

2.     <u>Significance of the Parties' Relative Sophistication</u>

Before turning to Defendants' arguments under these principles, the Court will address McNees's primary counterargument, which seeks to avoid the economic loss doctrine altogether. McNees asserts the doctrine "is intended to apply only" when the plaintiff and defendant were both sophisticated parties when entering into the relevant contract(s). (ECF No. 75 at 4.)

McNees supports this argument in two ways. First, he provides the following quote from the Colorado Court of Appeals: "The [economic loss] rule is applied to determine whether tort law or contract law provides the remedy for a plaintiff's loss. When sophisticated parties have bargained for the allocation of risks and remedies for nonperformance, it prevents unanticipated tort liability from undermining their reliance

on their bargain." *A Good Time Rental, LLC v. First Am. Title Agency, Inc.*, 259 P.3d 534, 537 (Colo. App. 2011). Second, he claims, "It is for this reason [that] every case cited by [Defendants] affirming the application of the doctrine arises from disputes involving commercial contracts entered into by sophisticated entities . . . ." (ECF No. 75 at 4.)

The quoted language from *A Good Time Rental* is a statement of the benefits that sophisticated parties gain through the economic loss doctrine, not a statement that the economic loss doctrine applies only among sophisticated parties. Moreover, although McNees is correct that Defendants' cited cases appear to have been disputes between sophisticated parties, the Colorado Court of Appeals has applied the economic loss doctrine to dismiss tort claims between residential homeowners and their mortgage lender. *Miller v. Bank of New York Mellon*, 379 P.3d 342, 345–46 & 348 (Colo. App. 2016).

In any event, if the parties' sophistication is a threshold consideration for applying the economic loss doctrine, one would expect the Colorado Supreme Court to have said so explicitly. McNees has not directed this Court to any such decision, nor is the Court aware of any. Indeed, although the economic loss doctrine is common in American jurisdictions, McNees has not directed the Court to any decision anywhere in the country imposing (or even contemplating) a sophistication-based threshold inquiry.

The Court therefore rejects this argument and turns to Defendants' arguments.

3.    Application to Various Claims

According to Defendants, the claims that fail under an economic loss analysis are McNees's claims for negligence (Claim 1), negligent hiring and supervision (2), negligent misrepresentation (5), fraud (6), civil conspiracy (8), and breach of fiduciary

19

duty (10). (ECF No. 71 at 4.) The Court will discuss these claims in four groupings, and in the following order: first, the three negligence-based claims; second, fraud; third, fiduciary duty; and fourth, civil conspiracy.

a. *Negligence-Based Claims (Claims 1, 2, and 5)*

McNees's negligence claim asserts that Defendants "undertook a duty to exercise reasonable care in dealing with [his] mortgage loan," but breached that duty, "resulting in improper foreclosure . . . thereby causing damages to the plaintiff . . . and entitling plaintiff an order voiding Deutsche Bank's title to the Property." (ECF No. 65 at 21, ¶¶ 99–100.) McNees's negligent hiring and supervision claim argues that Deutsche Bank, by contracting with Ocwen, and Ocwen, by contracting with third parties, "had a duty to hire loan servicers and loan servicing representatives that were competent in handling basic loan servicing functions." (*Id.* ¶ 102.) Both Defendants allegedly breached this duty, "result[ing] in the improper sale of [McNees's] home at a foreclosure sale in December 2015 causing damages to [him] . . . and entitling him to the rescission of the foreclosure sale of the Property." (*Id.* ¶ 105.) Finally, McNees's negligent misrepresentation claim asserts that Defendants provided him with false information "concerning the servicing of the Note, Deed of Trust, and 2011 Modification, and the amounts necessary for Plaintiff to cure any arrearage concerning the Mortgage loan on this Property." (*Id.* ¶ 121.) McNees further asserts, without detail, that he relied on this information, "causing damage . . . and entitling [him] to an order voiding the foreclosure sale and declaring the title in the Property presently claimed by Deutsche Bank as void." (*Id.* ¶ 125.)

By comparison, McNees's contract-based claims (Claims 3 and 4) argue that Defendants breached the promissory note, deed of trust, and 2011 modification terms

by, for example, failing to properly service the loan (such as through properly applying payments, properly calculating escrow balances, etc.), failing to provide McNees with accurate information, charging fees that were not warranted under the governing documents, and foreclosing on his home based on faulty information. (*Id.* ¶¶ 111, 117.) As a result, McNees claims that he has incurred damages and that he is "entitle[d] . . . to an injunction preventing the sale of the Property at a foreclosure sale." (*Id.* ¶¶ 112, 119.) The Court confidently presumes that the request for an injunction against foreclosure (which happened in December 2015) is an artifact of McNees's counsel's pleading template, and that counsel—consistent with the Prayer for Relief—meant to request an order restoring McNees's home to him. (*See id.* ¶ 167.)

In this light, the Court must ask "(1) whether the relief sought in negligence is the same as the contractual relief; (2) whether there is a recognized common law duty of care in negligence; and (3) whether the negligence duty differs in any way from the contractual duty." *BRW*, 99 P.3d at 74. McNees never confronts these inquiries, instead relying heavily on his argument (rejected above) that economic loss does not apply when the parties are not equally sophisticated. Regardless, turning to the first consideration, the answer is unmistakable: McNees's contract-based claims and negligence-based claims seek the same relief.

As for the second consideration, one paragraph from McNees's response brief may have been intended as an argument for a duty of care in negligence:

> At the time the loan documents were formed, there was no such thing as [the federal Home Affordable Modification Program], [the Home Affordable Refinance Program], the terms of traditional modifications changed over time and with varying programs, and the simple process of accepting payments, calculating escrow balances, and other traditional

21

> services have changed dramatically in the loan servicing
> industry following the outsourcing of such services to third-
> party providers and other entities.  A combination of both
> contractual and tort duties exist in the consumer lending
> context and not all duties assumed by a loan servicers are
> contemplated in loan documents executed decades prior.

(ECF No. 75 at 6.)  Whatever else this paragraph is meant to convey, it does not reveal

a "recognized common law duty of care in negligence."  *BRW*, 99 P.3d at 74; *see also*

*Town of Alma*, 10 P.3d at 1263 (likewise requiring "a recognized independent duty of

care").  Nor does McNees propose a duty of care and ask the Court to predict that the

Colorado Supreme Court would recognize it.  Rather, he offers only a "cloud of

possibilities . . . generally coalescing around a supposed duty to do all of the things [he]

thinks [Defendants] should have done to prevent [this] lawsuit."  *Villalobos v. Vision*

*Graphics, Inc.*, 2019 WL 1098971, at *5 (D. Colo. Mar. 8, 2019).  That contrasts with the

"rather clear terms" by which the Colorado Supreme Court recognizes new duties of

care.  *Id.* at *6.

For two reasons, the Court further finds that it would be futile to permit

amendment so that McNees could make such an argument.  First, instead of

addressing the principles of the economic loss doctrine directly, McNees has largely

attempted to argue around them—strongly suggesting that he has no argument to make

for a new duty of care.  Second, the Court's own research has located nothing in

Colorado case law suggesting that the Colorado Supreme Court would recognize a duty

of care in the mortgage servicing context beyond what the relevant contracts already

require.

As for the third *BRW* consideration—"whether the negligence duty differs in any

way from the contractual duty," 99 P.3d at 74—McNees offers nothing that could be

construed, even generously, as addressing this question.  He entirely ignores it.

For all these reasons, McNees's Claims 1, 2, and 5 will be dismissed with prejudice.[6]

        b.     *Fraud (Claim 6)*

Fraud is an intentional tort, but the economic loss doctrine may still apply depending on the nature of the alleged fraud.  *See Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 291–96 (Colo. App. 2009) (discussing various possible scenarios).  Fraud in the inducement of a contract likely falls outside the economic loss doctrine, *see United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000) (applying Colorado law), but "fraud relating to the performance of a contract" is generally redressable only through a breach of contract claim if it leads only to the damages one would expect from a breach, *Hamon Contractors*, 229 P.3d at 292.

McNees claims that the fraud at issue here consisted of false representations to McNees regarding the status of his loan, his compliance with the payment schedule, etc.; and false representations to Broomfield County entities regarding the same.  (ECF No. 65 ¶¶ 127–31.)  "As a result of Defendants' false representations," McNees alleges that he has been "damaged . . . and is entitled to the rescission of the foreclosure sale." (*Id.* ¶ 136.)

McNees therefore alleges fraud relating to the performance of the relevant contracts and he claims damages that one would expect from a breach of those contracts.  This appears to fall under the economic loss doctrine, and McNees offers no argument for an exception.  Indeed, his entire argument as to fraud is to point out that

---

[6] This disposition moots Defendants' alternative arguments for dismissing the negligent hiring claim.  (*See* ECF No. 71 at 6–7.)

courts have "repeatedly rejected the application of the economic loss doctrine" as to fraud claims, and then to string-cite a number of supposedly relevant cases without explaining how they apply to his own fraud claim.  (ECF No. 75 at 6 & n.4.)

In these circumstances, the Court finds that the economic loss doctrine applies to his fraud claim.  Claim 6 will therefore be dismissed with prejudice.[7]

### c.    *Fiduciary Duty (Claim 10)*

Assuming Defendants, or either of them, assumed a fiduciary duty toward McNees, then by definition there was a duty of care existing independent of the contracts between McNees and Defendants.  Accordingly, the question is whether any fiduciary duty arose.  In Part III.D, above, the Court held that the answer is "no."  Thus, McNees fails to state a claim for fiduciary duty and the economic loss question is moot.

### d.    *Civil Conspiracy (Claim 8)*

Civil conspiracy "is a derivative cause of action that is not actionable per se." *Double Oak Const., L.L.C. v. Cornerstone Dev. Intern., L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003).  The goal of a civil conspiracy claim is to hold the defendants vicariously liable for each other's wrongful actions.  *See Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, 2016 WL 8416760, at *11 (D. Colo. July 13, 2016).  "To establish a civil conspiracy in Colorado, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result."  *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995).

---

[7] This disposition moots Deutsche Bank's alternative argument that the fraud claim should be dismissed at least to the extent it alleges misrepresentations made to and relied on by third parties (*i.e.*, the Broomfield County entities).  (ECF No. 74 at 5–6.)

As a result of this order, McNees will be left with three contract-based causes of action (Claims 3, 4, and 9) and a cause of action for violation of the CCPA (Claim 7). The Court has found no authority for the idea that the unlawful overt act required for a CCPA claim can be a breach of contract. To the contrary, case law discussing the CCPA usually speaks of the unlawful act in terms of torts or tort-like wrongs. *See, e.g.*, *Sterenbuch v. Goss*, 266 P.3d 428, 435 (Colo. App. 2011); *Double Oak*, 97 P.3d at 146. To be clear, these courts were not asked to decide whether civil conspiracy may apply to a contract-based cause of action—but neither does McNees ask this Court to decide that question. Absent an argument from him that the Colorado Supreme Court would recognize a contractual breach as an unlawful overt act to support a civil conspiracy claim, the Court will not predict as much.

As for the CCPA, however, it is clearly a tort-like cause of action, even though created by statute. Moreover, Defendant elected not to argue that the economic loss doctrine subsumes the CCPA. (*See* ECF No. 77 at 4 n.4.) Accordingly, because there is at least one cause of action—of statutory fraud—falling outside of the economic loss doctrine to which civil conspiracy might apply, the Court rejects Defendants' economic loss argument as to McNees's Claim 8.

### IV. OBSERVATIONS REGARDING CONFERRAL & SANCTIONS

The parties' briefs contain accusations and counter-accusations apparently meant to imply that the other did not participate in good faith in the pre-filing conferral required under WJM Revised Practice Standard III.D.1. (*See* ECF No. 71 at 1–2; ECF No. 75 at 1–2.) In addition, McNees argues that Defendants' challenges to his claims for negligent hiring, breach of the covenant of good faith and fair dealing, and CCPA

violations are "sufficiently bogus to merit a request for attorney's fees for having to draft a response." (ECF No. 75 at 10.) Finally, as to Defendants' arguments against his third-party breach of contract claim, McNees accuses Defendants of discovery misconduct related to a request for whatever contract exists between Ocwen and Deutsche Bank, and he argues that "attorney's fees [should be] awarded as a sanction pursuant to Fed. R. Civ. P. 37 for Mr. McNees having to respond to this portion of the Motion to dismiss." (*Id.*)

To the extent McNees's requests for sanctions were meant as a motion, and not a suggestion or an idle threat, they are denied because he has not brought them as separate motions. *See* D.C.COLO.LCivR 7.1(d); WJM Revised Practice Standard III.B. And, although the Court has denied Defendants' motions to the extent they were directed at McNees's good faith/fair dealing and CCPA theories, the Court does not find that Defendants' arguments are beyond what a "reasonable attorney admitted to practice before the district court" could be expected to file, *Collins v. Daniels*, 916 F.3d 1302, 1320 (10th Cir. 2019), so the Court sees no reason to consider Rule 11 sanctions *sua sponte*.

As for the parties' accusations about each other's good faith, the Court will not speculate on which side is more to blame, if either. The Court strongly encourages, and indeed expects, counsel for both sides to make a conscious effort at treating the other side with professionalism and respect, and will have little patience for future conduct by any counsel which does not comport with this expectation.[8]

---

[8] Defendants' counsel accuses McNees's counsel of threatening to seek sanctions and then abruptly hanging up in the middle of a pre-filing conferral phone call. (ECF No. 71 at 2–3.) At this stage, the Court will make no finding on whether this happened, or whether it happened precisely as Defendants' counsel represents. The Court only warns that such behavior, from

## V.  CONCLUSION

For the reasons set forth above, Ocwen's Motion to Partially Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 71) and Deutsche Bank's Motion to Partially Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 74) are both GRANTED to the extent that Claims 1, 2, 5, 6, 10, and 11 of the Second Amended Complaint (ECF No. 65) are DISMISSED WITH PREJUDICE, but otherwise the motions are DENIED.

Dated this 22nd day of April, 2019.

BY THE COURT:

William J. Martinez
United States District Judge

---

either side, is unacceptable.  When conferral is required by the Local Rules or the undersigned's Practice Standards, good faith requires each party to hear the other out.