**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 16-cv-1055-WJM-KLM

JOHN L. MCNEES,

     Plaintiff,

v.

OCWEN LOAN SERVICING, LLC, a Delaware limited liability corporation, and
DEUTSCHE BANK NATIONAL TRUST COMPANY, as trustee for Ameriquest Mortgage
Securities Inc. Asset-Backed Passthrough Certificates, Series 2003-11, under the
pooling and servicing agreement date[d] November 1, 2003,

     Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION TO STRIKE AS MOOT, AND TERMINATING CASE**

---

Plaintiff John L. McNees contends that his home was unlawfully taken from him
through foreclosure.  Proceeding *pro se*, he filed this lawsuit in May 2016.  (ECF No. 1.)
At that time, the only defendants were Ocwen Loan Servicing, LLC ("Ocwen") and
placeholder "Doe" defendants.  There has since been motion practice, the appearance
and withdrawal of an attorney for McNees, and the appearance of a new attorney on his
behalf.  Despite the already-lengthy proceedings, the Court granted McNees's motion,
through his new attorney, to file a second amended complaint because the proposed
complaint was McNees's "first professionally drafted complaint, and sets forth [his]
allegations with much greater clarity than before."  (ECF No. 64.)  As filed, the Second
Amended Complaint dropped the "Doe" defendants but added Defendant Deutsche
Bank National Trust Company ("Deutsche Bank").

Following additional motion practice, McNees's Second Amended Complaint was winnowed to claims for "breach of contract, breach of the implied covenant of good faith and fair dealing, third-party breach of contract, violation of the Colorado Consumer Protection Act [('CCPA'), Colo. Rev. Stat. § 6-1-105], and civil conspiracy." (ECF No. 90 at 2.)[1] By way of relief, McNees seeks: damages, including treble damages and attorneys' fees under the CCPA; to recover title to his home (*i.e.*, to void Deutsche Bank's title and rescind the foreclosure sale); and an order of specific performance that Deutsche Bank comply with the terms of the governing loan documents. (ECF No. 65 ¶¶ 167–70.)

Currently before the Court is Defendants' Motion for Summary Judgment. (ECF No. 95.) For the reasons explained below, the Court grants the motion. In consequence, judgment will enter in Defendants' favor and McNees's Motion to Strike Affirmative Defense of Colorado Credit Agreement Statute of Frauds (ECF No. 108) will be denied as moot.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the

---

[1] The Court dismissed his claims for breach of fiduciary duty, negligence, and fraud. (*See id.* at 14–15, 20–24.)

nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

The following facts are undisputed unless attributed to a party or otherwise noted.

### A. Background Regarding the Home and the Mortgage

#### 1. 1980: Original Purchase of the Property

The property at issue here is a single-family residential home in Broomfield, Colorado ("Property"), that McNees purchased in 1980. (ECF No. 100 ¶ 1.) The record does not state how he financed the original purchase.

#### 2. 2003: New Mortgage (Promissory Note & Deed of Trust)

In 2003, McNees he took out a new mortgage loan against the property, in the amount of $198,000. (*Id.*) Town and Country Credit Corporation financed the loan through the usual arrangement—a promissory note in Town and Country's favor in the amount of $198,000, secured by a deed of trust encumbering the Property. (*Id.*) Four provisions from the note or deed of trust (or both) are particularly relevant to the disputes that eventually arose, leading to this lawsuit.

First, the deed of trust states that the lender "may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current,"

and the lender may also "accept any payment or partial payment insufficient to bring the Loan current, without a waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future." (ECF No. 95-2 at 4.)

Second, the deed of trust states, "No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the [promissory note] and this [deed of trust] or performing the covenants and agreements secured by this [deed of trust]." (*Id.*)

Third, the deed of trust requires the borrower to maintain sufficient homeowner's insurance. (*Id.* at 6.) If the borrower fails to maintain insurance, the deed of trust permits the lender to acquire insurance, potentially at a higher cost, and charge that to the borrower:

> If Borrower fails to maintain any of the [required coverages], Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower . . . . Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

(*Id.*)

Fourth, the note and deed of trust both state that any notice from the lender to the borrower will be mailed to the address of the encumbered property unless the borrower gives the lender notice of a different mailing address. (ECF No. 95-1 at 2; ECF No. 95-2 at 10–11.)

3. <u>2009: Deutsche Bank's Acquisition and Securitization</u>

By no later than 2009, the note ended up as one of many such notes comprising

a mortgage-backed security managed by Deutsche Bank.[2]  Over the ensuing years,

Deutsche Bank hired various entities to service the loans.  (ECF No. 100 at 9, ¶ 3.)

Each of these entities operated under a Pooling & Servicing Agreement with Deutsche

Bank.  The Pooling & Servicing Agreement grants the "Master Servicer" power to

"institute foreclosure proceedings" and "to bring or respond to civil actions or complaints

(in its own name or that of the Trust Fund or the Trustee on behalf of the Trust Fund)

related to any Mortgage Loan, [or] Mortgaged Property."  (ECF No. 100-6 at 86.)  It also

requires the master servicer to

> service and administer the Mortgage Loans on behalf of
> [Deutsche Bank] and in the best interests of and for the
> benefit of the Certificateholders [essentially, the investors]
> (as determined by the Master Servicer in its reasonable
> judgment) in accordance with (i) the terms of the respective
> Mortgage Loans and any insurance policies related thereto,
> (ii) all Applicable Regulations, (iii) the terms of this
> Agreement, (iv) the Loss Mitigation Action Plan, if applicable,
> and (v) to the extent consistent with the preceding
> requirements, in the same manner in which it services and
> administers similar mortgage loans for its own portfolio,
> giving due consideration to customary and usual standards
> of practice of prudent mortgage lenders and loan servicers
> administering similar mortgage loans . . . .

(*Id.*)  The master servicer further has power to

> waive, modify or vary any term of [a] Mortgage Loan [in
> default or imminent default] (including modifications that
> would change the Mortgage Rate, forgive the payment of
> principal or interest or extend the final maturity date of such
> Mortgage Loan), accept payment from the related Mortgagor
> of an amount less than the Stated Principal Balance in final

---

[2] The parties have conflicting accounts about what happened between closing on the loan in 2003 and the assignment of the note to Deutsche Bank (which assignment was recorded in 2009)—yet the parties also admit each other's accounts.  (*Compare* ECF No. 95 at 3, ¶¶ 1–4 *with* ECF No. 100 at 2; *and compare* ECF No. 100 at 8–9, ¶¶ 1–2 *with* ECF No. 106 at 5.)  The precise details are immaterial to the parties' disputes, so the Court need not address the conflicts.

> satisfaction of such Mortgage Loan, or consent to the
> postponement of strict compliance with any such term or
> otherwise grant indulgence to any Mortgagor . . . .

(*Id.* at 88–89.)

New York law governs the Pooling & Servicing Agreement, without regard to conflicts of laws.  (*Id.* at 180.)

**B.    The 2011 Loan Modification**

By early 2011, the master servicer on McNees's loan was Homeward Residential, Inc. ("Homeward"), which is not a defendant in this lawsuit.  (ECF No. 95 at 3, ¶ 5 & n.1.)

In March 2011, McNees entered into a Loan Modification Agreement with Homeward.  (*Id.* at 4, ¶ 7.)  Apparently McNees had fallen behind on his mortgage payments because the Loan Modification Agreement provided, among other things, that approximately $3,900 "in pre-modification accrued late charges, modification fees, and other expenses would be deferred until the maturity date reflected in the modification." (ECF No. 100 at 11, ¶ 7.)  The Agreement further stated that it did not modify the promissory note or deed of trust except as expressly stated.  (ECF No. 95-5 at 1–2.)

The Loan Modification Agreement established a new monthly payment of $1,447.24 for principal and interest, plus escrowed amounts for property taxes and insurance, at that time calculated at $200.80—for a total new monthly payment of $1,648.04.  (ECF No. 95 at 4, ¶ 8.)  On April 1, 2011, however, Homeward sent McNees a monthly billing statement in the amount of $1,648.17 (thirteen cents higher than stated in the Loan Modification Agreement), due May 1, 2011.  (*Id.* ¶ 9.)  Then, in May 2011, Homeward sent McNees an escrow statement announcing that, starting June 1, 2011, his new payment would be $1,668.26 (more than $20 higher than stated in the Loan

Modification Agreement) due to an escrow shortage. (*Id.* ¶ 12.) But McNees did not consider either of the increased payments to be a breach of the Loan Modification Agreement. (*Id.* ¶¶ 10, 13.) Rather, he began making payments of $1,668.26 beginning in June 2011. (ECF No. 100 at 11, ¶ 7.) He sent these payments by cashier's check from North Dakota, where he was working "in the oil field." (*Id.*; ECF No. 100-3 ¶ 21.)

**C.      Lender-Placed Insurance in 2011**

Sometime before October 31, 2011, McNees's insurance coverage for the Property lapsed. (ECF No. 95 at 5, ¶ 14.) On October 31, 2011, Homeward sent McNees a letter stating that it had obtained temporary insurance coverage for the Property and that it would take out a one-year lender-placed insurance ("LPI") policy for the property if McNees did not secure his own coverage "before the end of the temporary insurance period." (ECF No. 95-9 at 1–2.) The letter stated that the amount of coverage under the LPI policy "will be based on your last known coverage amount," but, consistent with the deed of trust, warned that "the premium may be considerably higher than insurance you can purchase." (*Id.* at 2.)

McNees did not obtain replacement insurance before the deadline. (ECF No. 95 at 5, ¶ 17.) By letter dated January 10, 2012, Homeward notified McNees that it was placing a one-year LPI policy on the Property, covering October 2011 through October 2012. (*Id.* ¶ 18.)

**D.      Payment Disputes**

1.      <u>May–September 2012: Recalculation of Escrow & McNees's Failure to Pay Recalculated Amounts</u>

On May 19, 2012, Homeward sent McNees his annual escrow disclosure

statement. (*Id.* at 6, ¶ 21.) The escrow statement announced that his new payment

would be $1,940.40, beginning July 1, 2012 (*id.* ¶ 22)—as compared to the $1,668.26

he had been paying since June 2011.[3] The bulk of the increase came from increases in

escrow and escrow shortage to cover the LPI premium, which cost about $1,200 more

per year than the previous homeowner's policy. (*See id.*; ECF No. 95-12; ECF No. 100

at 12, ¶ 9.)

McNees was still (or again) working out-of-state at the time and he did not

arrange to forward his mail. (ECF No. 95 at 6, ¶ 27.) Thus, he did not receive the

escrow recalculation and he continued making payments of $1,668.26 (the old amount)

from July through October 2012. (*Id.* ¶¶ 23–24.) Homeward began to hold each partial

payment in a suspense account until it received sufficient funds to total $1,940.40. (*Id.*

¶ 25.)

2.    October–December 2012: McNees's Dispute Regarding LPI

On October 31, 2012, Homeward sent McNees a notice that it would renew the

LPI policy for an additional year because McNees still had not obtained his own

coverage. (*Id.* at 7, ¶¶ 29–30.) Shortly after this, McNees realized that there was a

significant difference between what Homeward expected him to pay and what he had

been paying. (ECF No. 100 at 13, ¶ 13.) Apparently he called Homeward to complain,

because Homeward sent him a letter dated November 13, 2012, apologizing for "any

inconvenience that you may have experienced with the Customer Care Associates."

(ECF No. 95-13 at 1.)

---

[3] Defendants' brief says that the escrow statement made the new payment effective
June 1, 2012 (*id.*), but Defendants elsewhere say July 1, 2012 (*id.* at 27) and the underlying
exhibit also says that new payment is "effective July 1, 2012" (ECF No. 95-12 at 1). The Court
presumes that Defendants' initial reference to June 1 is a typo.

This same letter went on to discuss the late charges and other charges that had been deferred as part of the 2011 Loan Modification Agreement. (*Compare id. with* ECF No. 100 at 5 n.11; *see also* Part II.B, above.) It is not clear what prompted Homeward to write about these late fees—perhaps McNees had discussed them with Homeward in his earlier telephone conversation. In any event, the letter said that "the late charges assessed are valid and Homeward is unable to waive them. You may choose to pay the accrued late charges in parts, along with the monthly payments." (ECF No. 95-13 at 1.) McNees understands this statement as "confirm[ing] that pre-2011 modification late charges were not . . . immediately due," consistent with the Loan Modification Agreement. (ECF No. 100 at 5 n.11.)

The letter also included a discussion of the May 2012 escrow analysis leading to a new payment of $1,940.40 as of July 1, 2012. (ECF No. 95-13 at 3–4.) The letter then presented, in table format, an accounting of the amounts Homeward had received from McNees since June 2012 and how it had applied those amounts. (*Id.* at 4–5.) According to this table, Homeward:

- applied the June 2012 payment to the payment owed for that month, because it was the correct payment amount for that month;

- applied the July 2012 payment exclusively to the suspense account, creating a suspense account balance of $1,668.26;

- applied the August 2012 payment plus $272.14 from the suspense account (*i.e.*, the difference between $1,940.40 and $1,668.26) to the past-due July payment, leaving $1,396.12 in the suspense account;

- repeated that process with the September 2012 payment, applying it to

the past-due August payment, and leaving $1,123.98 in the suspense account;

- applied the October 2012 payment to the suspense account, creating a suspense account balance of $2,792.24;

- later in October, pulled $1,940.40 from the suspense account and applied it to the past-due September payment, leaving $851.84 in the suspense account;

- applied the November 2012 payment to the suspense account, creating a suspense account balance of $2,520.10; and

- the next day in November, pulled $1,940.40 from the suspense account and applied it to the past-due October payment, leaving $579.70 in the suspense account.

(*Id.*)  Following the table, the letter said that "[t]he account is currently due for the November 1, 2012 payment in the amount of $1,940.40, with the outstanding late charges [and similar charges that had been deferred in the Loan Modification Agreement]," all of which summed up to $5,953.06.  (*Id.* at 5.)  However, given the $579.70 in the suspense account, "the total amount due on the loan is $5,373.36."  (*Id.*)

McNees contacted Homeward and the LPI insurance provider to dispute the cost of the LPI policy—specifically, he considered it an "overcharge" because the policy "overvalued" the Property.  (ECF No. 100 at 13, ¶ 13; ECF No. 95 at 7, ¶ 28.)  Among his communications with Homeward was a handwritten letter that Homeward received on December 18, 2012, which included a check for $1,668.26.  (ECF No. 95 at 7, ¶ 32; ECF No. 95-15.)  The letter demanded that Homeward apply the payment "in the order

of principal, interest, taxes and the remainder to insurance," and declared that "[a]ny outstanding balance due to insurance charges will be in suspense until this issue is resolved as per your fiduciary duties as possessor of this note." (*Id.*)

One day later (December 19, 2012), Homeward sent McNees a letter titled "Notice of Right to Cure." (ECF No. 95-16.) The letter identified Homeward as the servicer and Deutsche Bank as the creditor. (*Id.* at 1.) It further stated that McNees was required to pay $7,429.50 by January 23, 2013, and if he did so, he could "continue with the contract as though [he] were not late [in making payments]." (*Id.*) But "[i]f you do not pay by this date," the letter continued, "we may exercise our rights under the law." (*Id.*)[4]

### 3. January–February 2013: Continuing LPI Disputes & Recalculation of Escrow

Homeward sent McNees a letter dated January 7, 2013, that was similar to the November 13, 2012 letter, but with updated numbers reflecting how payments had been applied in December. (ECF No. 100-7.) In that respect, Homeward had placed all of McNees's December payment ($1,668.26) into the suspense account (creating a balance of $2,247.96), and then pulled $1,940.40 from the suspense account and applied it to the past-due November payment (leaving a suspense account balance of $307.56). (*Id.* at 7.) The letter announced that "[t]he account is currently due for the

---

[4] McNees says that the cure amount of $7,429.50 was inaccurate because it failed to account for his December 2018 check, and improperly included fees that had been deferred in the Loan Modification Agreement. (ECF No. 100 at 5 n.13.) Defendants respond that the cure amount was good through January 23, 2013, meaning that it must have included the January 1, 2013 payment. (ECF No. 106 at 3, ¶ 33.) As for the deferred charges, Defendants point out that the Loan Modification Agreement did not modify Deutsche Bank's rights under the deed of trust, including the right to accelerate all amounts owed: "thus once the loan went into default Deutsche Bank was no longer required to defer demanding payment of those amounts." (*Id.*) The Court need not decide whether this presents a genuine dispute of material fact for reasons that will become clear in Part III.B, below.

December 1, 2012 payment and subsequent payment [*i.e.*, the January 1, 2012 payment] in the amount of $3,880.80 [*i.e.*, $1,940.40 x 2]." (*Id.*) The letter further stated that the total amount due, including late charges at issue in the Loan Modification Agreement, minus funds in the suspense account, was $7,672.66. (*Id.*)

On January 8, 2013, McNees sent a letter to Homeward accusing it of "fail[ing] to do [its] fiduciary duty," and enclosing a payment of $1,668.26.[5] (ECF No. 95 at 8, ¶¶ 34–35.)[6] No party points the Court to any tabulation (as in the November 13, 2012 and January 7, 2013 letters) of how Homeward applied this payment. The parties appear to agree, however, that Homeward applied it as it had applied previous short payments. (*See* ECF No. 100 at 13, ¶ 15; ECF No. 106 at 6 n.5.) In other words, Homeward deposited it into the suspense account, creating a balance of $1,975.82, and then drew $1,940.40 from the suspense account and applied it to the past-due December payment, leaving a suspense account balance of $35.42.

The Notice of Right to Cure letter from the previous month set a deadline of January 23, 2013, for a cure payment. McNees did not pay the cure payment by that date. (ECF No. 95 at 9, ¶ 39.)[7]

---

[5] At times McNees's version of events says that he submitted payments in 2013 of $1,668,2<u>8</u>, not $1,668.2<u>6</u>. (*See* ECF No. 100 at 13, ¶¶ 15–16.) And within the same brief, McNees sometimes claims differing payment amounts for the same month. (*Compare id.* at 6 n.16 (February 2013 payment was $1,668.23) *with id.* at 13, ¶ 16 (February 2013 payment was $1,668.28).) Homeward's official ledger consistently shows payments of $1,668.26 for the relevant months (*see* ECF No. 95-19), so the Court will use that amount and assume that McNees's variable amounts are typos. The difference between these amounts makes no difference in the Court's analysis.

[6] It is unclear if McNees had received Homeward's January 7, 2013 letter by the time he sent this letter to Homeward.

[7] McNees purports to deny this, but his denial is only an argument that he was not required to make a cure payment because, among other things, Homeward was demanding the late charges that had been deferred in the Loan Modification Agreement. (ECF No. 100 at 6

On February 5, 2013, Homeward sent McNees an escrow disclosure statement, announcing that the monthly payment would be reduced to $1,795.40, effective January 1, 2013. (ECF No. 95 at 8, ¶ 36.) McNees says that the escrow recalculation was due to a recalculation of the value of his home, done at his request, in turn leading to a recalculation of the LPI policy premium. (ECF No. 100 at 4 n.10.)

On February 19, 2013, Homeward received from McNees a payment of $1,668.26. (ECF No. 100 at 13, ¶ 16.) McNees does not say why he continued to submit his usual amount instead of $1,795.40. Unlike previous correspondence (and certain correspondence discussed below), McNees does not claim that he failed to receive the February 5, 2013 escrow recalculation—which, in any event, he says was done at his request.

It is not clear if Homeward deposited McNees's February 19 payment into the suspense account. If it had, it would have created a balance of $1,703.68—not enough to cover the past-due January payment of $1,795.40.

On February 21, 2013, Homeward sent McNees another "Notice of Right to Cure" letter, demanding that McNees pay $7,808.58 by March 28, 2013. (ECF No. 95 at 8, ¶ 38.)

Defendants claim that, on February 22, 2013, Homeward sent McNees a letter notifying him that Ocwen was replacing Homeward as the servicer for the loan, effective March 11, 2013. (*Id.* ¶ 40.) McNees says he "received the transfer letter several months after the fact and it was backdated." (ECF No. 100 at 6 n.19.)

---

n.18.) The basic fact—that he did not make a cure payment by appointed date—remains undisputed.

4. <u>March–Early June 2013: Ocwen Assumes Servicing Role & McNees
Continues to Pay Pre-Recalculation Amounts</u>

McNees sent a payment of $1,668.26 to Homeward on March 5, 2013.  (*Id*. at 14,

¶¶ 17–18.)  He says he sent this payment to Homeward, not Ocwen, because he had

not yet received notice of the transfer of his loan.  (*Id*. ¶ 17.)  As of March 5, however,

Homeward was still the servicer for six more days.  In any event, Homeward received

the check, endorsed it on March 15, 2013, and transferred it to Ocwen, which received it

on March 20, 2013.  (*Id*. ¶ 18.)

The Notice of Right to Cure letter from February 2013 set a deadline of March

28, 2013, for a cure payment.  McNees did not pay the cure payment by that date.

(ECF No. 95 at 9, ¶ 39.)[8]

On March 29, 2013, an Ocwen representative called McNees to say that he was

three payments behind and that Ocwen had not received a March 2013 payment.  (ECF

No. 100 at 14, ¶ 19.)  McNees responded that he had sent payments for February and

March 2013 and could not be three payments behind.  (*Id*.)  McNees also complained

that "the prior servicer was overcharging for LPI," and the Ocwen representative

responded that LPI is costly and McNees could still obtain his own insurance.  (*Id*.)

McNees made payments to Ocwen of $1,668.26 in both April and May 2013.  (*Id*.

¶¶ 21–22.)  McNees's account statements for that month (received from Ocwen) did not

specifically state that his regular monthly payment was $1,795.40.  Instead, they

itemized all of the current charges (principal, interest, and escrow), minus previous

partial payments, yielding a total due by the first of the next month; followed by an

itemization of past-due principal, interest, and escrow, yielding a total of "Past Due

---

[8] *See* n.7, above.

Amounts DUE IMMEDIATELY"; and finally an itemization of late charges persisting since the Loan Modification Agreement, with no claim as to a due date. (ECF No. 100-9 at 2, 4 (capitalization in original).)[9]

In "late May 2013," McNees secured his own homeowner's policy through Allstate, and Allstate notified Ocwen by fax on June 4, 2013, that the new premium was $1,228.57. (ECF No. 100 at 15, ¶ 23.) Ocwen did not recalculate the escrow amount in light of the information received from Allstate. (*Id.* ¶ 24.) McNees does not say if he asked Ocwen to recalculate escrow at this time.

## E. Default Proceedings

### 1. Late June–August 2013: Inconsistent Notices of Default

McNees paid Ocwen $1,668.26 on June 17, 2013. (*Id.* at 16, ¶ 25.) Like his April and May 2013 account statements, his June 2013 statement nowhere specifically stated that his expected monthly payment was $1,795.40. (*Id.*)

On June 21, 2013, Ocwen sent McNees two "Notice of Default" letters. (*Id.* ¶ 26.) The first was a Colorado-specific demand letter on a form Ocwen only sent to Colorado borrowers. (*Id.*) The second was on a form not specific to Colorado borrowers. (*Id.*) One of the notices demanded a cure amount of $6,948.05, and the other demanded $7,708.10. (*Id.* nn.57–58.) Both notices purported to itemize the currently due charges, but those itemized amounts did not add up to either cure amount. (*Id.*)[10]

---

[9] A specific example is reproduced in Part III.D, below.

[10] McNees further emphasizes that neither cure amount matched the $9,503.50 that was supposedly "due immediately" according to his June 2017 account statement, received a few days before he received the notices of default. (*Id.* ¶¶ 25, 27.) But the June 2013 account statement did not say that $9,503.50 was due immediately. That figure is the total amount owed when accounting for all of the charges itemized on the statement, including the monthly payment expected on July 1, 2013, past-due monthly payments, and the late charges at issue in the Loan Modification Agreement. (*See* ECF No. 100-9 at 6.) As before, no due date is

McNees paid $1,668.26 on July 15, 2013.  (*Id.* at 17, ¶ 28.)  He paid the same amount on August 12, 2013.  (*Id.* ¶ 29.)  As before, he received monthly account statements that did not specifically state that his regular monthly payment should be $1,795.40.  (*Id.* ¶¶ 28–29.)

On August 22, 2013, Ocwen sent McNees two more "Notice of Default" letters. (*Id.* ¶ 30.)  As before, one was Colorado-specific and the other was not; both claimed different cure amounts; and the itemized figures in both notices did not add up to either cure amount.  (*Id.*)

2.  September–December 2013: Additional Payments & Claims Regarding the March 2013 Lost Payment

McNees paid Ocwen $1,668.26 on September 12, 2013; $1,673.34 on October 4, 2013; and $1,673.34 on November 6, 2013.  (*Id.* at 18, ¶¶ 33–35.)  It is unclear why McNees added $5.08 to the October and November payments.  Regardless, his account statements for those months did not specifically show that his regular monthly payment should be $1,795.40.  (*Id.* at 18–19, ¶¶ 33–34, 36)

On November 12, 2013, Ocwen sent McNees a letter about his March 2013 payment—the payment McNees sent to Homeward and Homeward forwarded to Ocwen, but Ocwen never applied to McNees's account.  (*Id.* at 18, ¶ 35; *see also* Part II.D.4, above.)  In that letter, Ocwen announced that it had returned McNees's check— actually a cashier's check from his North Dakota bank—"to the remitter" on March 29, 2013.  (ECF No. 100 at 18, ¶ 35.)  However, the North Dakota bank has no record of receiving the check.  (*Id.*)

---

assigned to the late charges.  (*Id.*)  The only amount the June 2013 statement declares to be due immediately is the past-due monthly payments, calculated at $5,386.20.  (*Id.*)

In December 2013, McNees sent two payments to Ocwen, both in the amount of $1,673.34. (*Id.* at 19, ¶ 38.) He does not explain why he sent two payments, nor the amount of the payments. As it turned out, Ocwen rejected those payments. (ECF No. 100-3 ¶ 42; ECF No. 106 at 8 n.18.) McNees says that Ocwen rejected his November and October 2013 payments also, but he was not aware of those rejections until months later because Ocwen would send the cashier's checks back to the bank and it would take time for the bank to refund the amount into McNees's account. (ECF No. 100-3 ¶ 42.)

3.    <u>January–Early July 2014: Additional Payments & Additional Notices of Default</u>

McNees paid Ocwen $1,673.34 on January 7, 2014. (ECF No. 100 at 20, ¶ 39.) On January 14, 2014, Ocwen sent McNees a Colorado-specific "Notice of Default" letter, once again demanding a cure amount that bore no relation to the various itemized charges. (*Id.*)

A few days later, Ocwen sent a January 2014 account statement "that for the first time . . . plainly identified the mortgage payment amount of $1795.40." (*Id.*) The same statement said that Ocwen had refunded McNees's January 7 payment on January 9, 2014. (*Id.*; ECF No. 100-17 at 2.) In other words, Ocwen rejected the January payment.

On February 4, 2014, McNees paid Ocwen $1,673.34. (ECF No. 100 at 20, ¶ 40.) Ocwen accepted this payment. (*Id.*)

On February 15, 2014, Ocwen sent yet another "Notice of Default" letter claiming a cure amount of $16,013.24. (*Id.* & n.74.) Unlike in the previous letters, this cure amount is the sum of the itemized amounts listed in the letter. (*Id.*) That same day,

however, Ocwen also sent a Colorado-specific "Notice of Default" letter claiming a cure amount of $15,263.17, which was not the sum of the itemized amounts listed. (*Id.* at 21, ¶ 41.)

McNees paid Ocwen $1,673.34 in each of March and April 2014, and $1,669.20 in each of May, June, and July 2014. (*Id.* ¶ 42; ECF No. 100-3 ¶ 48.) It is not clear how he chose these payment amounts. His statements for February and March 2014, both of which showed what was owed as of the first of the following month, specified $1,795.40 as the expected monthly payment. (ECF No. 100-17 at 14, 18.) His statements for April and May 2014, both of which showed what was owed as of the first of the following month, specified $1,803.93 as the expected monthly payment. (*Id.* at 22, 26.)[11] The reason for the increase to $1,803.93 is not clear.

McNees says that his March, April, and May 2014 statements "did not reflect the payments [he] made in those months." (ECF No. 100 at 21, ¶ 42.) Defendants say that this is because Ocwen rejected those payments. (ECF No. 106 at 9 n.22.) When foreclosure proceedings eventually commenced (see below), Ocwen's representatives communicated to McNees's attorney that Ocwen had rejected and returned every payment McNees made from March 2014 onward. (*See* ECF No. 100-21 at 2–3; ECF No. 100-23 at 3.)

4.    <u>Late July 2014–December 2015: Foreclosure</u>

Ocwen stopped sending its typical monthly statements and instead, beginning in late July 2014, sent statements demanding the total amount due on the loan. (ECF No. 100 at 21, ¶ 43.) The July 2014 statement specifically announced, "Your loan has

---

[11] Ocwen did not send a monthly statement in June 2014. (ECF No. 100 at 21, ¶ 43.)

been accelerated and the accelerated amount is now due." (ECF No. 100-17 at 34.)

McNees made no payment to Ocwen in August 2014, but paid $1,669.20 in each of September, October, November, and December 2014 (ECF No. 100-3 ¶ 48), and the same amounts in January, February (twice), and April 2015 (*id.* ¶ 51)—all of which Ocwen apparently rejected. McNees also asked Ocwen to perform an escrow analysis in April 2015 on account of the Allstate policy McNees had secured in late May 2013. (ECF No. 100 at 15, ¶ 24; *see also* Part II.D.4, above.) That escrow analysis reduced his monthly payment "back to roughly $1690.00 per month." (ECF No. 100 at 15, ¶ 24.)

The escrow recalculation was, however, something of a sideshow by that time. The main event had begun back on October 21, 2014, when Deutsche Bank filed a motion in Broomfield County Court for an order authorizing a foreclosure sale. (ECF No. 95 at 12, ¶ 55.) McNees retained an attorney to contest the foreclosure proceeding, and that attorney filed an objection on November 25, 2014, arguing that Deutsche Bank had miscalculated his monthly payments had overcharged him, and that he otherwise timely made all required payments. (*Id.* ¶ 56.) The Broomfield County Court entered an order on May 4, 2015 authorizing foreclosure. (*Id.* ¶ 57.) Deutsche Bank bought the Property at auction on December 9, 2015. (*Id.* ¶ 58.)[12]

---

[12] McNees purports to dispute the statements in this paragraph, but does not explain the basis of his dispute. (*See* ECF No. 100 at 8.) The statements are therefore deemed undisputed. In any event, filings in the Broomfield County Court are matters of public record (*see* ECF Nos. 95-27, 95-28, 95-29, 95-30), and McNees cannot possibly mean to say that he denies the Property was sold at foreclosure—the foreclosure is foundational to his claims against Defendants.

# III.  ANALYSIS

## A.  Statute of Limitations for CCPA Violations and Civil Conspiracy (Deutsche Bank Only)

Defendants first argue that, as against Deutsche Bank, the statute of limitations for McNees's civil conspiracy and CCPA claims expired before McNees filed suit against Deutsche Bank.  (ECF No. 95 at 14–21.)[13]

McNees filed this lawsuit on May 9, 2016 (ECF No. 1), naming Ocwen and others as defendants, but he did not propose naming Deutsche Bank as a defendant until September 12, 2018, when he moved for leave to file a second amended complaint (ECF No. 63).  The Court granted that motion, and the Second Amended Complaint was officially filed, on September 17, 2018.  (ECF Nos. 64, 65.)

The parties appear to agree that September 17, 2018, is the date by which the statute of limitations should be judged as to Deutsche Bank (*see* ECF No. 95 at 15; ECF No. 100 at 23–24),[14] unless the relation back doctrine applies (discussed below). In that light, McNees's civil conspiracy claim needed to accrue on or after September 17, 2016, *see Deutsche Bank Tr. Co. Americas v. Samora*, 321 P.3d 590, 594–95 (Colo. App. 2013) (applying two-year tort catch-all statute of limitations contained in Colorado Revised Statute § 13-80-102(1)(a) to civil conspiracy), and his CCPA claim needed to accrue on or after September 17, 2015, *see* Colo. Rev. Stat. § 6-1-115

---

[13] Defendants' statute of limitations argument extends only to the civil conspiracy and CCPA claims, and only as against Deutsche Bank.  McNees's arguments that all of his claims are timely against both Defendants (*see* ECF No. 100 at 26–30) are therefore irrelevant to the extent they go beyond Defendants' argument.

[14] Given the parties' agreement, the Court need not address whether the date on which the plaintiff *moved* for leave to amend is the proper date for statute of limitations purposes.  In this case, the date on which McNees moved and the date the Court granted that motion were only five days apart, so it likely would not matter in any event.

(three-year statute of limitations).

McNees does not argue that his CCPA and civil conspiracy claims against Deutsche Bank accrued on or after those dates. He instead argues for relation back of his claims against Deutsche Bank to the filing of the original complaint against Ocwen on May 9, 2016. (ECF No. 100 at 23–26.)

> An amendment to a pleading relates back to the date of the original pleading when * * * the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied [*i.e.*, "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading"] and if, within the period provided by Rule 4(m) for serving the summons and complaint [*i.e.*, 90 days], the party to be brought in by amendment:
>
> > (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> >
> > (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).

Anticipating McNees's reliance on this rule, Defendants argue in their motion that "McNees has presented no evidence that the omission of Deutsche Bank as a descendent from his earlier complaints was the result of a 'mistake' as the term is used in [Rule 15(c)(1)(C)(ii)]" because "McNees was familiar with Deutsche Bank years prior to the filing of even his original Complaint," including through Notices of Right to Cure from December 2012 on February 2013, which identified Deutsche Bank as the creditor. (ECF No. 95 at 16.)[15] McNees responds with the Supreme Court's holding in *Krupski v.*

---

[15] By its text, Rule 15(c)(1)(C) applies to a pleader's attempt to "change[] the party or the naming of the party against whom a claim is asserted," not to a pleader's attempt to *add* a party

*Costa Crociere* that "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing [the] original complaint." 560 U.S. 538, 548 (2010) (emphasis in original). In this light, the question is not so much whether the plaintiff actually made a mistake, but whether "the proper defendant could reasonably believe that the plaintiff made no mistake." *Id.* at 549.

Here, Defendants offer no argument why Deutsche Bank could reasonably believe that McNees made no mistake. In addition, McNees asserts that Deutsche Bank was on notice of the lawsuit from the beginning because McNees sued Ocwen, and the rights and responsibilities granted to Ocwen in the Pooling & Servicing Agreement mean that "Ocwen . . . *is* effectively Deutsche Bank for servicing and foreclosure purposes." (ECF No. 100 at 25 (emphasis in original).) McNees also cites unpublished cases from this District holding that a lawsuit against one party acts as notice to another party if the two parties' business operations and activities are closely related. (*Id.*) In reply, Defendants address neither the argument that Ocwen effectively acted as Deutsche Bank nor the case law McNees cites. (*See* ECF No. 106 at 18–20.)

In this light, the Court agrees with McNees that his original complaint, which named Ocwen as a defendant, provided the notice required by Rule 15(c)(1)(C)(i); and

---

to an existing claim. Some courts have therefore held that the rule only applies when seeking to substitute one party for another, while doctrines such as tolling address whether additional parties may be added when the statute of limitations has otherwise expired. *See, e.g.*, *Telesaurus VPC, LLC v. Power*, 2011 WL 5024239, at *1–7 (D. Ariz. Oct. 21, 2011) (surveying courts' diverging approaches to this question and concluding that Rule 15(c)(1)(C) applies only to substitution, not addition). Here, the Second Amended Complaint *added* Deutsche Bank to claims McNees was *also asserting* against Ocwen. But Defendants make no argument that Rule 15(c)(1)(C) is the inappropriate rule to apply in this circumstance. Defendants argue only that there was no mistake within the meaning of Rule 15(c)(1)(C)(ii). Accordingly, the Court need not decide whether cases such as *Telesaurus* properly interpret Rule 15(c)(1)(C).

as for Rule 15(c)(1)(C)(ii), Deutsche Bank could not have reasonably viewed McNees's failure to sue it separately as something other than a mistake.  Thus, the date McNees filed the original complaint against Ocwen (May 9, 2016) is the date by which all statutes of limitations should be judged.  Defendants make no argument that McNees's civil conspiracy and CCPA claims against Deutsche Bank are untimely even if judged by that date.  The Court therefore rejects Defendants' statute of limitations argument as to the civil conspiracy and CCPA claims asserted against Deutsche Bank.

**B.    Breach of Contract & Breach of the Covenant of Good Faith and Fair Dealing**

Defendants next argue that McNees cannot prove his claims for breach of contract and breach of the covenant of good faith and fair dealing.  The elements of breach of contract in Colorado are: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff."  *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (citations omitted) ("*Diodosio*").  "The performance element . . . means substantial performance," *i.e.*, even if the plaintiff has "deviated from [the contract] in trifling particulars," the defendant received "substantially the benefit [it] expected."  *Id.* (internal quotation marks omitted).

As for the breach of the implied covenant of good faith and fair dealing, it may apply

> when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. The covenant may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party.  However, it will not contradict terms or conditions for which a party has bargained.

*Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (citations omitted).

Drawing from these principles, Defendants argue that McNees cannot succeed on his contract claims because he cannot prove the second element of breach of contract: "performance by [himself] or some justification for nonperformance." *Diodosio*, 841 P.2d at 1058. Defendants understand McNees to be alleging that Defendants' breaches began with Ocwen's mishandling of his March 2013 payment (during the transition from Homeward to Ocwen), and those breaches continued with Ocwen's miscalculations (or inconsistent calculations) about cure amounts and Ocwen's choice to sometimes accept his payments and sometimes reject them. As it turns out, McNees's response brief confirms Defendants' understanding of McNees's contract claims—in particular, that "occurrences from March 2013 onward . . . form the basis for [his] claims against [Defendants]." (ECF No. 100 at 2; *see also id.* at 30–36.) Defendants contend that McNees was already in substantial breach by that time, with no justification for nonperformance. Defendants' argument runs as follows:

- McNees's homeowner's insurance lapsed in October 2011.

- Homeward (Ocwen's predecessor) purchased the LPI policy and charged it to McNees, as it was entitled to do under the deed of trust.

- In May 2012, Homeward recalculated the necessary escrow payments to compensate for the LPI policy, yielding a new monthly payment of $1,940.40, beginning July 1, 2012.

- Homeward sent notice of the new payment to McNees in May 2012. McNees may not have received it then, but that was due to McNees's failure to have his mail forwarded. Homeward fulfilled its obligation under

the note and deed of trust to send notice to the address of the encumbered property.

- McNees, unaware of the recalculation, continued to pay the previous monthly amount of $1,668.26 from July through October 2012.

- When McNees learned in late October or early November 2012 that he had been underpaying, he intentionally chose to continue underpaying because he believed the LPI policy premium was too high. He specifically declared that "[a]ny outstanding balance due to insurance charges will be in suspense until this issue is resolved" (ECF No. 95-15), contrary to the deed of trust's provision stating that "[n]o offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the [promissory note] and this [deed of trust]" (ECF No. 95-2 at 4).

- By the time Homeward sent the second "Notice of Right to Cure" letter (on February 21, 2013), McNees was far enough behind that his February 2013 payment plus the remainder in the suspense account was not enough to cover the January 2013 payment. In other words, he was two months behind.

- McNees never paid the cure amount.

- Accordingly, McNees cannot prove that he performed, or had a justification for not performing, as of the time Defendants' alleged breaches arose.

(ECF No. 95 at 22–30, 34–35.)

What is McNees's response to this chain of reasoning? To the Court's surprise, he mostly ignores it. Indeed, the legal argument section of his response brief *entirely* ignores it. (*See* ECF No. 100 at 23–40.) As for the factual section of his brief, he addresses only two of Defendants' premises: the LPI policy and the calculation of the cure amount.

Concerning the LPI policy, he describes it as "excessive," "unwarranted," and an "overcharge." (*See, e.g.*, ECF No. 100 at 3 n.4; *id.* at 4, nn.9–10; *id.* at 13, ¶ 13.) But these attacks are purely rhetorical. He never addresses the language from the deed of trust invoked by Defendants, which forbids McNees's self-help approach (*i.e.*, paying only what he personally believed to be reasonable), and he never cites any authority that would otherwise override the deed of trust's language on this question—indeed, he says nothing at all about this part of the deed of trust.

Concerning the calculation of the cure amount, McNees insists that it inappropriately included the pre-modification late charges that the 2011 Loan Modification Agreement deferred until the end of the modified loan term.[16] Even if true, McNees cannot reasonably dispute that, by the end of February 2013, he had failed to pay enough to cover either his January or February 2013 payments. McNees offers no authority for the notion that his actions could still be considered "substantial performance" when he was two months behind due to self-help efforts that were prohibited by the relevant contract.[17] In addition, the undisputed evidence shows he

_____

[16] *See* n.4, above.

[17] McNees says he was "a single payment behind" when he began disputing the LPI policy (ECF No. 100 at 5 n.13), and "less than a single payment behind" when Homeward accepted his February 2013 payment (*id.* at 6, n.16). He does not explain his math. For both propositions, he instead cites the entirety of his 10-page summary judgment affidavit—which

had no intent to pay any cure amount, but instead to fight Homeward's supposed breaches of fiduciary duty.  (See Parts II.D.2 & II.D.3, above.)

Given McNees's total lack of relevant argument or authorities, the Court deems him to confess Defendants' argument that his material breaches before March 2013 prevent him from being able to prove that he substantially performed.  Because he cannot prove that basic element, he cannot sue Defendants for alleged breaches that postdated his own material breach.

## C.    Third-Party Breach of Contract

Defendants argue that McNees cannot prove his third-party breach of contract claim.  This claim rests on the notion that McNees was a third-party beneficiary of the Pooling & Servicing Agreement, particularly its wide grant of discretion to the master servicer to "grant indulgence" to a borrower in default.  (ECF No. 100 at 30–31 (quoting ECF No. 100-6 at 88–89); *see also* Part II.A.3, above.)

New York law governs the Pooling & Servicing Agreement.  (ECF No. 100-6 at 180.)  It therefore also applies to any claim for third-party breach of contract.  *See* Restatement (Second) of Contracts § 309 cmt. b (1981) ("Where there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract."); *Brown v. Fryer*, 2013 WL 1191405, at *2 (D. Colo. Mar. 22, 2013); *cf. ADT Sec. Servs., Inc. v. Apex Alarm, LLC*, 430 F. Supp. 2d 1199, 1201 (D. Colo. 2006) ("a forum selection clause encumbers a third-party beneficiary who could reasonably have foreseen its designation as beneficiary").

---

contains no calculations on this issue.  (*See* ECF No. 100-3.)  Regardless, he still cites no authority for the notion that one can be behind on one's payments in any amount due to self-help efforts prohibited by the relevant contract, yet nonetheless be in substantial performance.

The Second Circuit, applying New York law, has passingly endorsed the Fifth

Circuit's statement that "'courts invariably deny mortgagors third-party status to enforce

[pooling and servicing agreements].'" *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d

79, 86 (2d Cir. 2014) (quoting *Reinagel v. Deutsche Bank Nat'l Tr. Co.*, 735 F.3d 220,

228 n.29 (5th Cir.2013)).  Defendants suggest that the Court may deny McNees's third-

party beneficiary claim on this basis alone.  (ECF No. 106 at 15.)  The Fifth Circuit's

statement may well be true—McNees does not cite, and the Court has not found, any

case allowing a mortgagor to sue as a third-party beneficiary under a pooling and

servicing agreement.  But whatever the Second Circuit saw in the Fifth Circuit's

approach, the analysis in *Rajamin* appears to turn on a failure to plausibly allege the

necessary elements of a third-party breach claim under New York law, rather than a

blanket prohibition of this sort of claim.  *See id.* at 86–87.  The Court will therefore

examine the elements.

To sustain a third-party breach of contract claim under New York law, McNees

must prove

> (1) the existence of a valid and binding contract between
> other parties, (2) that the contract was intended for his
> benefit and (3) that the benefit to him is sufficiently
> immediate, rather than incidental, to indicate the assumption
> by the contracting parties of a duty to compensate him if the
> benefit is lost.

*Burns Jackson Miller Summit & Spitzer v. Lindner*, 451 N.E.2d 459, 469 (N.Y. 1983).[18]

No party disputes that the first element is satisfied here.  As for the second and

---

[18] If Colorado law applied, the analysis would be essentially the same.  *See Baker v. Wood, Ris & Hames, Prof'l Corp.*, 364 P.3d 872, 881 (Colo. 2016) ("Colorado law recognizes that a person not a party to an express contract may bring an action on the contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely incidental benefit of the contract.").

third elements, McNees's only argument is that

> McNees and other borrowers are plainly intended third-
> beneficiaries [*sic*] of the [Pooling & Servicing Agreement],
> since it permitted Ocwen to "grant indulgence to any
> Mortgagor ([such as] waivers, modifications, variances,
> forgiveness of principal or interest, postponements, or
> indulgences . . .[)]" and permitted Ocwen to "waive, modify or
> vary any term of such Mortgage Loan (including
> modifications that would change the Mortgage Rate, forgive
> the payment of principal or interest or extend the final
> maturity date of such Mortgage Loan), accept payment from
> the related Mortgagor of an amount less than the Stated
> Principal Balance in final satisfaction of such Mortgage Loan,
> or consent to the postponement of strict compliance with any
> such term."

(ECF No. 100 at 31 (quoting ECF No. 100-6 at 88–89).)  McNees appears to argue that

the mere *existence* of this provision shows the requisite *intent* to bestow an enforceable

benefit on the third-party mortgagors.  He cites no authority for this proposition.  Nor

does he explain what benefit was conferred upon him by this wide-open discretion

granted to the servicer.

In addition, the Pooling & Servicing Agreement directs the servicer to "service

and administer the Mortgage Loans on behalf of [Deutsche Bank] and in the best

interests of and for the benefit of the Certificateholders (as determined by the Master

Servicer in its reasonable judgment)."  (ECF No. 100-6 at 86.)  In other words, if the

Pooling & Servicing Agreement seeks to confirm or unenforceable benefit on anyone, it

is not the mortgagors.[19]

Accordingly, the Court agrees with Defendants that McNees is unable to prove

an essential element of this third-party breach of contract claim.  Defendants are entitled

---

[19] Notably, when McNees quotes this portion of the Pooling & Servicing Agreement, he
omits, via ellipses, the portion about servicing in the best interests of the Certificateholders.
(*See* ECF No. 100 at 30.)

to summary judgment on this claim.

**D.     CCPA**

The Colorado Legislature enacted the CCPA "to regulate commercial activities and practices which, because of their nature, may prove injurious, offensive, or dangerous to the public.  The CCPA deters and punishes businesses which commit deceptive practices in their dealings with the public by providing prompt, economical, and readily available remedies against consumer fraud."  *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003).

> To prove a private cause of action under the CCPA, a plaintiff must show:
>
> (1) that the defendant engaged in an unfair or deceptive trade practice;
>
> (2) that the challenged [unfair or deceptive] practice occurred in the course of defendant's business, vocation, or occupation;
>
> (3) that [the challenged unfair or deceptive practice] significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;
>
> (4) that the plaintiff suffered injury in fact to a legally protected interest; and
>
> (5) that the challenged practice caused the plaintiff's injury.

*Id.* at 146–47.

Defendants argue that, whatever McNees claims to be the unfair or deceptive trade practices, he cannot prove the third element of his claim, regarding significant public impact.  (ECF No. 95 at 32–33, 36–37.)

> [The] relevant considerations to determine whether a challenged practice significantly impacts the public within the context of a CCPA claim . . . include (1) the number of consumers directly affected by the challenged practice,

30

> (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and
> (3) evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.

*Rhino Linings*, 62 P.3d at 149.

Defendants say that McNees's only possible evidence of public impact is "his awareness of instances of prior litigation against Ocwen by the Colorado Attorney General or others" (ECF No. 95 at 12, ¶ 59), which is "no[t] admissible evidence" (*id.* at 32–33, 36–37). Defendants emphasize that, in response to and interrogatory regarding public impact, McNees directed Defendants to a *Denver Business Journal* article reporting on settlement proceeds available to 3,850 Colorado homeowners under a consent judgment in a 2013 lawsuit brought by the Colorado Attorney General against Ocwen in the United States District Court for the District of the District of Columbia. (ECF No. 95-31 at 2.)[20] When asked about this same topic at his deposition, he said that his accusations were based on "public knowledge" of "lawsuits." (ECF No. 95-7 at 27–29.) Defendants argue that this sort of recounting of news reports about lawsuits cannot be admitted into evidence. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

In response, McNees does *not* argue that his testimony in this regard is admissible. Nor does he argue, *e.g.*, that he may (and is prepared to) introduce the

---

[20] In that lawsuit, the Colorado Attorney General alleged things such as "failing to timely and accurately apply payments," "failing to provide accurate and timely information to borrowers seeking information about loss mitigation services," and "with respect to [loans that had been modified], deceptively seeking to collect payments from the consumer under the mortgage's original unmodified terms." (*Id.*)

consent judgment itself into evidence, or that he can prove he is among the 3,850 Colorado homeowners entitled to relief under that judgment. Instead, he argues that he has other evidence showing public impact. The Court will address that additional evidence shortly. But given McNees's failure to respond to Defendants' argument that he lacks admissible evidence regarding other lawsuits, the Court deems McNees to concede Defendants' argument on that matter.

McNees asserts two other theories of public impact. The first theory relies on the existence of the Colorado-specific notice of default letters that he received on multiple occasions, along with testimony from an Ocwen representative that Ocwen initiated about 2,700 and single-family residential foreclosures in Colorado between 2013 and 2016. (ECF No. 100 at 37–38.) McNees says that his Colorado-specific letters usually never added up correctly, and he presumes that the other 2,700 borrowers likewise received mathematically incoherent notices. (*Id.*) However, to show public impact (assuming a mathematically incoherent notice is an unfair or deceptive trade practice), McNees needs evidence that other borrowers *actually* received the kinds of notices he received. His presumption alone is not evidence. Consequently, this theory fails to show public impact.

McNees's second theory is that the monthly statements he received from Ocwen between March and December 2013 were unfair or deceptive because they did not specify his regularly expected monthly payments. (ECF No. 100 at 38.) Ironically, McNees himself resorts to a bit of deception to give this claim more gravity, claiming that Ocwen eventually included the regularly expected payment on its monthly statements "at the urging of the Consumer Financial Protection Bureau" (*id.*)—as if the

CFPB came after Ocwen specifically on this matter.  The supporting exhibit, however, shows nothing so interesting.  The exhibit is a "Guide to Understanding Your New Billing Statement."  (ECF No. 100-28.)[21]  It has a question-and-answer section containing the following:

> Q:  Why has my statement changed?
>
> A:  The redesigned Mortgage Account Statement matches new guidelines set by the Consumer Financial Protection Bureau in 2013.

(*Id.*)  In other words, as far as McNees's evidence reveals, Ocwen was acting on a general directive to all servicers.

In any event, it is not clear that McNees was ever deceived by the lack of an explicit statement about his expected monthly payment.  As noted above (Part II.D.3), his payment in 2013 was $1,795.40, which was announced to him in a February 2013 escrow recalculation statement—which, he says, was generated at his request.  Thus, it is not clear that Ocwen's failure to state that number explicitly on his monthly statements had any effect on him.  But if it did, the Court agrees with Defendant that a reasonable jury could not deem the 2013 account statements to be "deceptive" within the meaning of the CCPA.  (ECF No. 106 at 13–14.)

Below is an example of the relevant portion of the account statement (this one happens to be from April 2013):

---

[21] McNees says that this document was mailed to all borrowers in December 2013 (ECF No. 100 at 38), but the document itself bears no date.

| Details of Amount Due | |
|---|---:|
| Current Amount Due: | |
| Principal: | 559.57 |
| Interest: | 887.67 |
| Escrow: | 348.16 |
| Less:Partial Payment Amount: | 1,541.12- |
| Current Amount Due by 05/01/13: | 254.28 |
| Past Due Amount: | |
| Principal: | 1,665.63 |
| Interest: | 2,676.09 |
| Escrow: | 1,044.48 |
| Past Due Amounts DUE IMMEDIATELY: | 5,386.20 |
| Assessed Fees/Expense Outstanding: | |
| Late Charges: | 3,295.03 |
| Prev-Prior Servicer Fees: | 18.49 |
| Curr-Property Inspection Fee: | 10.50 |
| Prev-Property Valuation Expense: | 119.00 |
| Total Fees/Expense Outstanding: | 3,443.02 |
| **Total Amount Due:** | **9,083.50** |

(ECF No. 100-9 at 2.)  This shows that the "Current Amount Due by 05/01/13" is $254.28, which is the sum of principal, interest, and escrow ($1,795.40), minus the "Partial Payment Amount" (apparently the balance of his suspense account at the time). McNees does not claim that paying the "Current Amount Due" would *not* have satisfied his upcoming monthly payment obligation.  Thus, he has no evidence that the 2013 account statements were deceptive.[22]

For these reasons, the Court finds that Defendants are entitled to summary judgment on McNees's CCPA claim.

## E.    Civil Conspiracy

Under Colorado law, civil conspiracy "is a derivative cause of action that is not actionable per se."  *Double Oak Const., L.L.C. v. Cornerstone Dev. Intern., L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003).  In other words, civil conspiracy is not a traditional cause of action, but "is a means for establishing vicarious liability for [an] underlying

---

[22] McNees further complains that Ocwen's account statements stopped displaying his expected monthly payment from July 2014 onward (ECF No. 100 at 39), but that is because Ocwen had accelerated his loan by then, so there was no longer any incremental monthly payment that would satisfy McNees's obligations to Ocwen (*see* Part II.E.4, above).

[wrong]." *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983). "If the acts alleged to constitute the underlying wrong provide no cause of action, then there is no cause of action for the conspiracy itself." *Double Oak*, 97 P.3d at 146.

The Court has found that McNees's primary causes of action fail, so his derivative civil conspiracy claim must fail as well. Even if one or more of the primary causes of action were viable, his argument for civil conspiracy is that "Deutsche Bank . . . failed . . . [to] supervise[] Ocwen's loan servicing activities in any way." (ECF No. 100 at 39.) He cites no authority for the notion that a failure to supervise amounts to a civil conspiracy. *Cf. Jet Courier Serv. Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989) (elements of civil conspiracy are: (1) two or more persons, (2) an object to be accomplished, (3) an agreement on the object or course of action, (4) one or more unlawful overt acts, and (5) damages proximately caused by the unlawful overt act(s)).

For these reasons, Defendants are entitled to summary judgment on McNees's civil conspiracy claim.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion for Summary Judgment (ECF No. 95) is GRANTED;

2. McNees's Motion to Strike Affirmative Defense of Colorado Credit Agreement Statute of Frauds (ECF No. 108) is DENIED AS MOOT;

3. The Final Trial Preparation Conference set for July 24, 2020 and the five-day jury trial set to commence on August 10, 2020, are both VACATED;

4. The Clerk shall enter judgment in favor of Defendants and against Plaintiff, and shall terminate this case; and

5.     Defendants shall have their costs upon compliance with D.C.COLO.LCivR 54.1.

       Dated this 30th day of March, 2020.

                                    BY THE COURT:

                                    _____
                                    William J. Martinez
                                    United States District Judge